**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TOBY G. BREON,** | : | **CIVIL ACTION NO. 1:06-CV-2204** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **WAYPOINT INSURANCE GROUP, INC., SOVEREIGN BANCORP., INC., CLAIR ODELL INSURANCE AGENCY, LLC, and HUB INTERNATIONAL PENNSYLVANIA, LLC,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

Plaintiff Toby G. Breon ("Breon") brings this action pursuant to Section 510 of the Employee Retirement Income Security Act ("ERISA"), claiming that defendants Waypoint Insurance Group, Inc. and Sovereign Bancorp, Inc. (collectively "the Waypoint defendants") intentionally deprived him of benefits arising under an ERISA plan. Breon also asserts various state law claims against defendants Clair Odell Insurance Agency, LLC and HUB International Pennsylvania, LLC (collectively "the Odell defendants")[1] and the Waypoint defendants. Presently before the court are: (1) the Waypoint defendants' motion for summary judgment (Doc. 35), and (2) the Odell defendants' motion for summary judgment (Doc. 39). For the reasons that follow, the court will grant the Waypoint

[1] Pursuant to an agreement executed in 2006, Clair Odell Insurance Agency, LLC merged into HUB International Pennsylvania, LLC. (Doc. 39 at 1-2 n.1.) The two entities are treated as one for purposes of the instant memorandum.

defendants' motion with respect to the ERISA claim asserted against them and will decline to exercise supplemental jurisdiction over the remaining state law claims.

## I. Statement of Facts[2]

Beginning in 2000, Breon was employed by the property and casualty division of defendant Waypoint Insurance Group, Inc. ("Waypoint Insurance"). (Doc. 37 ¶¶ 2-3; Doc. 48 ¶¶ 2-3.) Breon was "an extremely successful insurance producer" and was "personally responsible for generating approximately 30 percent" of Waypoint Insurance's revenue in 2004. (Doc. 1 ¶ 10; Doc. 10 ¶ 10.) As a Waypoint Insurance employee, Breon was a participant in the Waypoint Employee Stock Ownership Plan ("ESOP"), which qualifies as an "employee welfare benefit plan" pursuant to ERISA. See 29 U.S.C. § 1002(1); (see also Doc. 1 ¶ 18; Doc. 10 ¶ 18.)

In January of 2005, Waypoint Financial Corporation ("Waypoint Financial"), the parent company of Waypoint Insurance, merged with defendant Sovereign Bancorp, Inc. (Doc. 37 ¶¶ 1, 85; Doc. 48 ¶¶ 1, 85.) As a consequence of the merger, Waypoint Financial elected to terminate the ESOP on the merger's effective date of January 21, 2005. (Doc. 37 ¶ 85; Doc. 48 ¶ 85.) Waypoint Financial also agreed to sell the property and casualty division of Waypoint Insurance to a third party before the merger's effective date. (Doc. 1 ¶ 13; Doc. 10 ¶ 13.) By the end of October 2004,

---

[2] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to Breon, as the nonmoving party. See infra Part II.

Waypoint Financial had chosen Odell as that third party.  (Doc. 1 ¶ 14; Doc. 10 ¶ 14.)  Odell's original purchase price for the property and casualty division was $2.3 million,[3] and the target closing date for the sale was December 1, 2004.  (Doc. 37 ¶¶ 6, 34; Doc. 48 ¶¶ 6, 34.)  The $2.3 million purchase price was conditioned upon all insurance producers, including Breon, entering into employment agreements with Odell.  (Doc. 37 ¶ 8; Doc. 48 ¶ 8.)  Given Breon's role as the "highest volume insurance producer" for Waypoint Insurance, the sales agreement between Waypoint Financial and Odell "was subject to a substantial reduction in sales price" if Breon did not agree to sign an employment contract with Odell.  (Doc. 1 ¶ 14; Doc. 10 ¶ 14.)

On October 28, 2004, Odell's Chief Operating Officer Robert Hill ("Hill") provided Breon with a draft employment agreement, and the two entered into a period of negotiations.  (Doc. 37 ¶ 17; Doc. 48 ¶ 17.)  On November 3, 2004, Hill informed Waypoint representatives that Breon was not "ready to sign" the employment agreement and was "considering going out on his own opening an agency."  (Doc. 42, Ex. B App. 3.)  Internal Waypoint emails from November 3, 2004 indicate that, upon learning of the problems in the Breon negotiations, the company began discussing the option of offering Odell a purchase price adjustment if Breon refused to sign.  (Doc. 51-17 at 11.)  Another internal Waypoint email

---

[3] One-hundred thousand dollars of this $2.3 million was to be placed in an escrow account to protect Odell in the event that the purchased division did not yield anticipated revenue levels.  (Doc. 37 ¶¶ 77, 80; Doc. 48 ¶¶ 77, 80.)

concluded that if Breon refused to sign with Odell, Waypoint would "need to terminate him and begin ASAP migrating his business to another producer so that [Waypoint] can continue with the sale process." (Doc. 42, Ex. B App. 2.)

At some point, Breon informed Hill that "time [wa]s of the essence" in their negotiations as Breon would be out of the country from November 10, 2004 until November 19, 2004. (Doc. 41-10 at 9.) On November 8, 2004, Breon identified specific changes that he desired to make to the draft employment agreement with Odell. (Doc. 37 ¶ 19; Doc. 48 ¶ 19.) Amongst these was a request for a $60,000 signing bonus, which Waypoint eventually agreed to finance as an aid to the negotiations between Odell and Breon. (Doc. 37 ¶¶ 31-32; Doc. 48 ¶¶ 31-32.) Hill acceded to the majority of Breon's alterations and returned a revised contract to Breon. On the morning of November 9, 2004, Breon proposed several additional corrections to the revised contract and told Hill that he planned to meet with his attorney at 2:00 p.m. to execute the contract. At a meeting with Waypoint representatives later the same day, Breon stated that several outstanding issues remained before he could sign an employment agreement with Odell. The Waypoint representatives informed Breon that he must have a signed agreement in place *before* he left the country the following day. (Doc. 37 ¶¶ 40-41; Doc. 48 ¶¶ 40-41.)

On November 10, 2004, Breon informed Hill that his attorney was planning to deliver additional contract modifications later that day and that Breon hoped to provide a signed agreement to Waypoint by 5:00 p.m. that evening. (Doc. 42, Ex. B

Att. 7.)  Hill received and reviewed the proposed amendments.  Hill assented to making several of the proposed changes but stated that a number of the other proposals signaled a "major disagreement" between the parties.  (Id. at Att. 8.)  Hill went on to state that he saw "no further need for discussion" if the proposed terms were essential to Breon and that he would "advice [sic] Waypoint that [the parties] could not reach a deal."  (Id.)  At 12:51 p.m., Hill advised several Waypoint officials that the negotiations had reached an impasse.  (Doc. 37 ¶ 44; Doc. 48 ¶ 44.)  Upon receiving this information, Waypoint Financial Senior Executive Vice President James B. Moss ("Moss") promptly informed Breon that if he did not sign an employment agreement with Odell by 4:00 p.m. that day, he would "suffer immediate loss" of his employment.  (Doc. 1 ¶ 25; Doc. 10 ¶ 25.)  Moss testified that he gave Breon this ultimatum because he wanted to impart upon Breon "a sense of urgency" to solidify the agreement before he left the country.  (Doc. 37 ¶ 49; Doc. 48 ¶ 39.)  Breon concedes that he had not reached an agreement with Hill by the 4:00 p.m. deadline.  (Doc. 1 ¶ 26; Doc. 10 ¶ 26.)  At approximately 4:10 p.m., Moss terminated Breon's employment.  (Doc. 1 ¶ 27; Doc. 10 ¶ 27.)  According to Breon,

Moss informed him that the termination was "based on the information that [Moss] had that negotiations have come to a standstill."[4]  (Doc. 37 ¶ 53; Doc. 48 ¶ 53.)

Following Breon's termination, Waypoint and Odell renegotiated the purchase price for the property and casualty division and agreed to lower the purchase price from $2.3 million to $2.1 million.  (Doc. 37 ¶ 76; Doc. 48 ¶ 76.)  In addition, the escrow amount was increased from $100,000 to $700,000.  (Doc. 37 ¶ 80; Doc. 48 ¶ 80.)  Following payment of this reduced price, Odell took control of the property and casualty division on December 1, 2004.  (Doc. 37 ¶ 81; Doc. 48 ¶ 81.)

The December 1, 2004 sale affected the former Waypoint Insurance employees' rights to their 2004 ESOP allocations because the ESOP required an employee to work through the end of a calendar year to receive his or her annual ESOP allocation.  (Doc. 37 ¶ 91; Doc. 48 ¶ 91.)  Cognizant of this unintended consequence of the sale, Waypoint Financial arrived at a solution.  The company placed each Waypoint Insurance employee in one of two categories.  Those who received an offer of employment from Odell and accepted such an offer, as well as those who did not receive such an offer, would remain Waypoint Insurance employees through the end of the calendar year and receive their 2004 ESOP

---

[4] Following his termination, Breon continued to negotiate with Hill.  Late in the evening of November 10, 2004, Breon signed a copy of the employment agreement and instructed his wife to hold it until his attorney authorized its release. (Doc. 37 ¶ 67; Doc. 48 ¶ 67.)  Breon left the country as scheduled, and his attorney refused to approve the contract.  (Doc. 37 ¶ 68; Doc. 48 ¶ 68.)  When Breon returned to the country in late November, his negotiations with Hill again resumed but were ultimately unsuccessful.  (Doc. 37 ¶¶ 69, 71; Doc. 48 ¶¶ 69, 71.)

allocations. Those who received and rejected an offer of employment from Odell would be terminated on the effective date of the rejection and would not receive their 2004 ESOP allocations. (Doc. 37 ¶¶ 87-89; Doc. 48 ¶¶ 87-89.) Because Breon was not employed by Waypoint at the end of the calendar year, he did not receive his 2004 ESOP allocation. (Doc. 37 ¶ 92; Doc. 48 ¶ 92.)

On November 9, 2006, Breon commenced the above-captioned action. (See Doc. 1.) Breon claims that the Waypoint defendants intentionally interfered with his ESOP benefits in violation of Section 510 of ERISA, 29 U.S.C. § 1140, and deprived him of his annual bonus and right to exercise his vested stock options. (Id. at 5-13.) Breon also claims that the Odell defendants tortiously interfered with his business relationship with Waypoint. (Id. ¶ 57.) Defendants filed two motions for summary judgment (Docs. 35, 39), which have been fully briefed and are ripe for disposition.

## II. Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality. See Fed. R. Civ. P. 56(c). It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## III. Discussion

Breon claims that the Waypoint defendants intentionally interfered with his ESOP benefits in violation of Section 510 of ERISA. Breon also asserts various claims pursuant to state law. The court will discuss these categories of claims *seriatim*.

### A. ERISA Claim

Breon contends that Waypoint terminated his employment with the specific intent of interfering with his right to receive ESOP benefits. The Waypoint defendants contend that their decision to terminate Breon was prompted by his unwillingness to sign an employment contract with Odell and was wholly unrelated to his right to receive ESOP benefits. Section 510 of ERISA makes it "unlawful for any person to discharge . . . a[n employee benefit plan] participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit] plan." 29 U.S.C. § 1140; see Scully v. Allegheny Ludlam Corp., No. 06-2252, 2007 WL 4294729, at *3 (3d Cir. Dec. 10, 2007) (quoting DiFederico v. Rolm Co., 201 F.3d 200, 203 (3d Cir. 2000)) (stating that Section 510 "makes it unlawful to interfere with the attainment of rights or benefits associated with an employee benefit plan"). Congress enacted Section 510

to "prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." Gavalik v. Continental Can Co., 812 F.2d 834, 851 (3d Cir. 1987). A plaintiff asserting a Section 510 claim against his or her employer must demonstrate that the employer "had the specific intent to violate ERISA." Scully, 2007 WL 4294729, at *3 (citing DeWitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997)). In other words, a plaintiff must show that "the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits." Jakimas v. Hoffmann-La Roche, Inc., 485 F.3d 770, 785 (3d Cir. 2007). However, a plaintiff need not prove that an intent to violate ERISA was the employer's sole motivation for an adverse action. Id. A plaintiff may use either direct or circumstantial evidence to establish the employer's specific intent. Rea v. Hershey Co. 2005 Enhanced Mut. Separation Plan, No. 06-1920, 2007 WL 776882, at *3 (M.D. Pa. Mar. 12, 2007) (citing DiFederico, 201 F.3d at 204-05).

Direct evidence in the context of a Section 510 claim "must demonstrate that decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Jakimas, 485 F.3d at 786. The Third Circuit has stated that this is a "high hurdle for plaintiffs because direct evidence must reveal a sufficient discriminatory or illegal animus making it unnecessary to rely on any presumption from the prima facie case to shift the burden of production." Id. "Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." Id. (quoting Clark v. Coats & Clark, Inc.,

990 F.2d 1217, 1223 (11th Cir. 1992)).  In most cases, "'smoking gun' evidence of specific intent to discriminate does not exist." Dewitt, 106 F.3d at 523.  In the instant case, no such direct evidence exists.  To the contrary, Breon admits that no Waypoint representative ever told him that he had been terminated to prevent him from obtaining ESOP benefits.  (Doc. 37 ¶ 61; Doc. 48 ¶ 61.)  Moreover, Breon concedes that he has never seen any documents evidencing or implying that he was terminated to prevent him from obtaining ESOP benefits.  (Doc. 37 ¶ 62; Doc. 48 ¶ 62.)  Accordingly, the court must rely upon circumstantial evidence to ascertain Waypoint's intent.

Section 510 claims premised on circumstantial evidence are evaluated using a burden shifting scheme.  To establish a prima facie case, the plaintiff must prove that: "(1) the employer committed prohibited conduct (2) that was taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Jakimas, 485 F.3d at 785.  "The burden of establishing a prima facie case is not onerous," and the court must draw all reasonable inferences in favor of the plaintiff.  Id. at 787.  Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant-employer to "articulate a legitimate, nondiscriminatory reason for the prohibited conduct." Id. at 786, 788.  Once the employer satisfies this burden, the plaintiff must "prove by a preponderance of the evidence that the reason articulated by the defendant is merely pretextual." Id.

Turning to the prima facie case, Waypoint clearly engaged in prohibited conduct when it elected to terminate Breon's employment. See Rea, 2007 WL 776882, at *3 (quoting 29 U.S.C. § 1140) (defining prohibited conduct as an employer's decision to "discharge, fine, suspend, expel, discipline, or discriminate against a[n employee benefit plan] participant"). Where Breon's evidence falls short is the second element of the prima facie case – the "taken for the purpose of interfering" element. The Third Circuit has stated that:

> where the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him. This kind of deprivation occurs every time an ERISA employer discharges an employee and is not alone probative of an intent to interfere with pension rights. Accordingly, a prima facie case requires additional evidence suggesting that pension interference was a motivating factor.

Scully, 2007 WL 4294729, at *3 (citing DeWitt, 106 F.3d at 523).

The summary judgment record contains no evidence from which a reasonable jury could conclude that Waypoint's decision to terminate Breon was motivated by a desire to deprive him of benefits. To the contrary, Waypoint correspondence dated more than a week before Breon's termination confirms that Waypoint began to consider terminating Breon's employment because of the potential financial impact of his continued refusal to sign with Odell. Waypoint representatives provided Breon with two warnings that his failure to contract with Odell would have adverse consequences and afforded him the opportunity to secure a signed employment agreement before he was terminated. Moss testified that he

 "wasn't thinking about benefits at all" when he made the decision to terminate Breon's employment."[5] (Doc. 42, Ex. G at 44.) Instead, he was "thinking about selling the [property and casualty] unit, and the unit sale being at risk if there were further delays." (Id.) Moss elaborated on his decision as follows:

> We had gone through a six-month process attempting to dispose of the [property and casualty] unit. We had what we thought was our best and last opportunity to dispose of the unit in hand. And it was dependent on producers signing an agreement.
>
> The agreement wasn't signed. We felt that we would reach an agreement not including Breon. Therefore we terminated him because he wouldn't enter into an agreement that would at that point in time enable us to sell the unit.

(Id. at 41.) Breon's sworn testimony confirms this. Breon stated, "It is my understanding that Moss terminated [me] because Clair Odell advised him that I

---

[5] Moss was aware of the manner in which the ESOP was structured and knew that Breon would not be eligible for an ESOP distribution in 2004 if he was terminated on November 10, 2004. (Doc. 42, Ex. G at 43.) Without more, Moss's knowledge of the effect of Breon's termination on his right to ESOP benefits is insufficient to establish a Section 510 claim. Bailey v. Tenneco, Inc., No. 92-1980, 1993 WL 379543, at *3 (W.D. Pa. July 6, 1993) (citing Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir. 1995)) ("[I]t is axiomatic that . . . an employer's understanding of [his or her] action's effect on an employee's pension benefits can[not], by itself, support a finding of specific intent required in the Third Circuit."). Moreover, Moss explained that his knowledge of the ESOP's structure did not affect his decision in the instant case:

> Q. You also knew that threatening him with termination would translate to his not being eligible for an ESOP distribution that year; isn't that correct?
>
> A. That may have been the result, but that had nothing to do with the process we went through [of] selling the unit and terminating his employment.

(Doc. 42, Ex. G at 42.)

was done negotiating with them." (Doc. 37 ¶ 64; Doc. 48 ¶ 64.) Breon also stated that Moss told him that the termination decision was "based on the information that [Moss] had that negotiations have come to a standstill." (Doc. 37 ¶ 53; Doc. 48 ¶ 53.) Breon's self-serving, post hoc assertion that Moss's decision was motivated by an intent to deprive him of benefits is little more than an attempt to manufacture federal jurisdiction where none exists. See Makenta v. Univ. of Pa., 88 F. App'x 501, 505 (3d Cir. 2004) (stating that "vague allegations of malicious termination, unsupported by any facts, are insufficient to support a claim for violation of Section 510"); see also Grogan v. Duane, Morris & Heckscher, No. 90-4105, 1991 WL 98888, at *4 (E.D. Pa. June 4, 1991) (stating that a plaintiff's "own subjective belief of [a] defendant's motive . . . is insufficient" to establish a Section 510 claim).

Breon's argument that a cost savings to Waypoint was a motivating factor behind his termination fares no better. Where the cost savings to an employer that results from an employee's ineligibility for benefits is asserted as a motivating factor for the employee's termination, the cost savings must be "of sufficient size that [it] may be realistically viewed as a motivating factor." Jakimas, 485 F.3d at 785; see Dewitt, 106 F.3d at 523 (finding that lack of savings to an employer from an employee's termination weighed against employee's Section 510 claim). In the instant case, the Waypoint ESOP was funded via annual contributions from Waypoint Financial, the amounts of which were wholly independent of the number of active participants in the ESOP. (Doc. 37 ¶¶ 97, 99; Doc. 48 ¶¶ 97, 99.) Accordingly, Waypoint Financial recognized no cost savings when a plan

participant, such as Breon, was terminated prior to the accrual of benefits. (Doc. 37 ¶¶ 100-101; Doc. 48 ¶¶ 100-101.) Balanced against this fictional cost savings is the $800,000 loss to Waypoint that Breon's termination prompted in the Odell transaction. Even the most elementary cost-benefit analysis reveals that Waypoint had no financial incentive to terminate Breon simply to deprive him of his ESOP benefits. Quite to the contrary, Waypoint was financially motivated to take every step necessary to preserve Breon's employment and to aid Breon in securing employment with Odell.

Finally, Breon argues that the temporal proximity between his termination and the vesting date of his ESOP benefits provides circumstantial evidence of a specific intent to interfere with his benefits. While temporal proximity can support a Section 510 claim in some circumstances, see Eichorn v. AT&T Corp., 248 F.3d 131, 150 (3d Cir. 2001), the timing of the relevant events in the instant case militates against such a finding. Breon was terminated on November 10, 2004, just three weeks before the target sale date of the property and casualty division to Odell on December 1, 2004. While Breon's pension benefits were scheduled to vest on December 31, 2004, the December 1, 2004 sale date breaks the chain of causation asserted by Breon. In fact, timing alone lends credence to Waypoint's argument that its decision was prompted by the looming closing deadline with Odell rather than by the scheduled ESOP vesting date.

For the foregoing reasons, the court finds that Breon has failed to meet his burden to prove that Waypoint terminated his employment for the purpose of

interfering with his ESOP benefits. Accordingly, the court will grant the Waypoint defendants' motion for summary judgment with respect to the ERISA claim against them.[6]

**B. State Law Claims**

The only remaining claims are contract and tort claims pursuant to state law. However, the parties have not articulated specific reasons for the court to entertain

---

[6] Assuming *arguendo* that Breon had established a prima facie case pursuant to Section 510, his claim would still fail for lack of evidence that Waypoint's proffered legitimate, nondiscriminatory reason was pretextual. To establish a legitimate, nondiscriminatory reason for its actions, an employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Berger v. Edgewater Steel Co., 911 F.2d 911, 923 n.17 (3d Cir. 1990) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981)). Waypoint has met this minimal burden in the instant case by pointing to the copious evidence that suggests that Waypoint's decision to terminate Breon was prompted by his refusal to sign a contract with Odell. To establish pretext, a plaintiff must either "directly persuade the court that the discriminatory reason more likely motivated the employer or indirectly persuade the court by showing that the employer's proffered explanation is unworthy of credence." Jakimas, 485 F.3d at 786. At a minimum, a plaintiff "must put forward enough evidence to create a genuine issue of material fact as to whether" the employer's proffered legitimate reasons were pretextual. Id. at 788. This requires a plaintiff to demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." Id. "A court . . . simply cannot make the unfounded inference that an employer acted with the specific intent to interfere with the plaintiff's attainment of benefits." Id. In the instant case, Breon has offered no evidence to suggest that Waypoint's proffered, nondiscriminatory reason is pretextual. All evidence of record, including Breon's own statements, indicates that he was terminated because of his refusal to sign an employment contract with Odell. The denial of ESOP benefits was an incidental consequence of Waypoint's business decision to terminate Breon to preserve its sales contract with Odell. The court cannot interfere with this business decision merely because Breon now makes an unfounded assumption that Waypoint was motivated by a desire to deprive him of benefits.

these claims in the absence of a federal cause of action, and the court declines to do so. See 28 U.S.C. § 1367(c) ("The district court[] may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.") (emphasis added).

## IV. Conclusion

For the foregoing reasons, the court will grant the Waypoint defendants' motion for summary judgment (Doc. 35) with respect to the ERISA claim. Having resolved Breon's only federal claim in favor of the Waypoint defendants, the court will decline to exercise supplemental jurisdiction over Breon's state law claims. Accordingly, the court will deny as moot the balance of the Waypoint defendants' motion for summary judgment (Doc. 35) and the Odell defendants' entire motion for summary judgment (Doc. 39). An appropriate order will issue.

S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated: March 31, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TOBY G. BREON,** | : | **CIVIL ACTION NO. 1:06-CV-2204** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **WAYPOINT INSURANCE GROUP, INC., SOVEREIGN BANCORP., INC., CLAIR ODELL INSURANCE AGENCY, LLC, and HUB INTERNATIONAL PENNSYLVANIA, LLC,** | : | |
| | : | |
| **Defendants** | : | |

**ORDER**

AND NOW, this 31st day of March, 2008, upon consideration of the motion for summary judgment (Doc. 35), filed by defendants Waypoint Insurance Group, Inc. and Sovereign Bancorp., Inc., and of the motion for summary judgment (Doc. 39), filed by defendants Clair Odell Insurance Agency, LLC and HUB International Pennsylvania, LLC, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion for summary judgment (Doc. 35), filed by defendants Waypoint Insurance Group, Inc. and Sovereign Bancorp., Inc., is GRANTED in part and DENIED in part as follows:

    a. The motion is GRANTED with respect to plaintiff's claim pursuant to Section 510 of the Employee Retirement Income Security Act, 29 U.S.C. § 1140.

    b. The motion is DENIED as moot with respect to all claims arising under state law.

2. The motion for summary judgment (Doc. 39), filed by defendants Clair Odell Insurance Agency, LLC and HUB International Pennsylvania, LLC, is DENIED as moot.

3. The Clerk of Court is directed to enter JUDGMENT against plaintiff and in favor of defendants Waypoint Insurance Group, Inc. and Sovereign Bancorp., Inc. on all claims arising under federal law.

4. The Clerk of Court is directed to CLOSE this case.


      S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge